# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JO A. BRINKLEY,

    Plaintiff,

  v.           Case No. 03-C-055

THE CITY OF GREEN BAY, et al.,

    Defendant.

## DECISION AND ORDER

Plaintiff Jo A. Brinkley sued the City of Green Bay, its fire department and insurer under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, for subjecting her to a hostile work environment from the time she began her employment with the City in 1995 and for retaliating against her when she complained. Plaintiff also asserted state law claims for negligent failure to investigate and control, negligent hiring and retention, and negligent infliction of emotional distress, and requested compensatory and punitive damages under both state and federal law.

The defendants previously moved for summary judgment on the grounds that the department was not a proper party, the alleged actions comprising plaintiff's hostile workplace claim occurred more than 300 days before her claim was filed with the EEOC, and she suffered no adverse employment action that would support a claim of retaliation. In a decision dated November 15, 2004, I dismissed all claims against the Department and granted summary judgment in favor of the City on plaintiff's retaliation claim. Concluding that at least some of the conduct that comprised her hostile workplace claim may have occurred within the statutory time period, however, I denied

the City's motion as to that claim but noted that the facts suggested the City may have a defense under *Ellerth/Faragher*.[1]

The City thereafter sought and was granted leave to file a supplemental motion for summary judgment on the ground that plaintiff's hostile workplace claim was barred under *Ellerth/Faragher*. It is that motion that is presently before me. Notwithstanding my earlier suggestion that the defense might apply, I now conclude that the City's supplemental motion for summary judgment must also be denied.

The facts of the case, stated in the light most favorable to the plaintiff, as well as the applicable standard for determining motions for summary judgment, were set forth in my previous decision and order, and will not be restated here except as necessary to address the present motion. Essentially, plaintiff's claim is that she has been subjected to sexual harassment throughout the time she has been employed as a Green Bay firefighter. The affidavit and deposition evidence submitted both in support of and in opposition to the defendants' motion for summary judgment, however, revealed that while plaintiff may have been subjected to sexually harassing behavior from fellow firefighters when she began with the department, the only specific conduct she complained of that fell within the 300-day limitations period was the presence of pornographic magazines in the fire station bathrooms and the comments of, and on one occasion the behavior of, firefighter Jon Schnell.[2] Plaintiff claimed that the presence of pornographic magazines even in bathrooms reserved

---

[1] See *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); and *Faragher v. Boca Raton*, 524 U.S. 775, 807-08 (1998).

[2] As noted in my earlier decision, plaintiff filed her complaint with the Equal Rights Division of the Wisconsin Department of Industry and Human Relations (ERD) on April 19, 2001. In order to be actionable, her hostile work place claim must be based at least in part on conduct that occurred within 300 days of her filing date or, in this case, after June 23, 2000.

2

for women firefighters made the working conditions hostile to women. Although plaintiff also complained that Schnell repeatedly questioned why female firefighters were entitled to a separate bathroom, I noted at the time that this would hardly constitute evidence of sexual harassment. However, plaintiff also recounted an incident in January of 2001 when upon seeing her washing dishes firefighter Schnell commented, "It's really nice to see a woman in the kitchen where she belongs." Plaintiff claims Schnell then placed his arm on her shoulder and didn't remove it until she warned him "you can remove it or you're going to lose it." (Aff. of Ann C. Wirth, Ex. 1, at 20-21.) Here, too, this allegation would seem to fall far short of the kind of evidence needed to support a claim for hostile work environment. The standard for a hostile work environment must be kept "sufficiently demanding to ensure that Title VII does not become 'a general civility code.'" *Faragher*, 525 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998)).

Nevertheless, in light of the earlier conduct plaintiff alleged and given the continued presence of pornography in the common areas of the fire station within the limitations period, I stated in my earlier decision that I was unable to conclude that plaintiff could not establish a continuing violation. (Nov. 11, 2004 Dec. at 13.) It was for this reason that I only partially granted summary judgment in favor of the City and allowed plaintiff's hostile workplace claim to proceed. The question presented by the instant motion is whether, even if plaintiff can establish a hostile work place, the City is not liable because of plaintiff's failure to utilize the complaint procedure the City had established for handling such complaints.

In *Ellerth* and *Faragher*, the Supreme Court set out the framework to determine whether an employer is liable in a hostile environment sexual harassment action. A key consideration under the framework established by the Court is whether the plaintiff suffered a "tangible employment

3

action." "A tangible employment action means a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. Where an employee suffers a tangible employment action as a result of a discriminatory act, *Ellerth* and *Faragher* hold that the employer is vicariously liable to the employee without regard to whether the employer knew of the harassment or took any effort to prevent it. *Id.* at 760-61; *Faragher*, 524 U.S. at 806-07. Where, however, the employee did not suffer a tangible employment action, *Ellerth* and *Faragher* hold that the defending employer may raise as a defense the fact that the complaining employee failed to take advantage of a procedure that the employer had established for resolving such complaints:

> The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth*, 524 U.S. at 765. *See also Faragher*, 524 U.S. at 807-08.

Here it is undisputed that plaintiff suffered no tangible employment action. She remains employed by the City to this day in the same capacity as when she filed her claim. It therefore follows that the City is not liable if it can establish that it exercised reasonable care to prevent and

4

to correct any sexually harassing behavior and plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities it provided. If the undisputed evidence establishes both elements, the City cannot be liable and its motion should be granted.

The undisputed evidence clearly establishes the first element. Throughout the period of time plaintiff has been employed by the City, the City has had in effect a written policy that explicitly prohibited sexual harassment. The policy, which incorporated the Equal Employment Opportunity Commission Guideline, Section 1604.11, stated: "Employees who have experienced, or are aware of, a situation which constitutes sexual harassment as outlined in Section 1604.11 of these guidelines are urged to contact their department head and/or the Personnel Director in order to resolve the problem." (Aff. of Melanie Falk ¶¶ 3-6, Ex. 1 at 1-3.) Copies of the policy were posted and delivered to all department employees in 1996. (Def.'s Add'l PFOF ¶ 103.) The City hired a consultant to put on presentations for management and training sessions for employees, including plaintiff. (*Id.* ¶¶ 104-108.) It also sent out a document entitled "Sexual Harassment in the Workplace" to all employees with their payroll information in 1998, again in 2001, and in every year thereafter. (*Id.* at ¶¶ 116-120.) These facts, none of which have been placed in dispute, establish that the City exercised reasonable care to prevent and promptly to correct sexually harassing behavior.

With respect to the second element of the defense, the City contends that plaintiff failed to use the available complaint procedure to address the problems she encountered. It argues that she failed to complain either to the Fire Department Chief (the department head) or the Personnel Director (now the Director of Human Resources) until February of 2001 and only then in response to a complaint by one of her co-workers against her. Once she did complain to the proper party,

Case 1:03-cv-00055-WCG   Filed 10/13/05   Page 5 of 16   Document 86

Fire Department Chief John Troeger promptly issued a series of directives addressing her complaints. Based upon these facts, the City claims plaintiff's hostile work environment claim should be dismissed.

As noted in my previous decision, the conduct plaintiff complained of falls into essentially three separate categories: (1) derogatory comments from co-workers; (2) issues involving restroom facilities; and (3) continual presence of pornography in the station houses.[3] The derogatory comments were primarily made shortly after plaintiff joined the Department, and some by individuals who have since retired. For example, shortly after she was hired in 1995, plaintiff claims that Pete Sponholz, her lieutenant in training, told her "you bitches don't belong here, so I'm not going to do [the training]." (Wirth Aff., Ex. 1 at 17.) Plaintiff contends she complained about Sponholz's conduct, and an investigation was undertaken. Although she suggests nothing was done, she has offered no evidence that Sponholz engaged in similar conduct at any time thereafter or harassed her in any way. (*Id.* at 17-19.)

Plaintiff claims that several other co-workers made comments such as "it's nice to see a woman in the kitchen," or "boy, if we could just get you pregnant while you were in here, that would be perfect," or "a woman's place is on her knees." (*Id.* at 23.) Plaintiff said when she complained to the co-workers themselves they would do it more often. She finally talked to the engineer, who was also the union president, and threatened to go to the chief. It stopped for a little

---

[3]Plaintiff also complained that one of her co-workers had moved his arm across her chest so as to touch her breasts on three separate occasions in approximately 1997. She also testified that around the same time she would wake up at night and he would be standing over her bed watching her. The behavior stopped, however, when she threatened to go to the Chief. Plaintiff admits she never reported the incident to the Chief or anyone else. Plaintiff has made no other allegations of inappropriate sexual contact. (Pl.'s PFOF ¶ 92-94; Wirth Aff., Ex. 1 at 19, 33-35.)

6

while, but then started up again. Rather than file a complaint with the chief, who was the department head, or the personnel office, plaintiff transferred to a different station at the end of 1996. (*Id.* at 23.)

Plaintiff also complained that in 1996 her house captain, Tom Tolkins, who has since retired, would watch appreciatively as she got into her "turn-out gear," noting that she had to "kind of wriggle into it." (*Id.* 26-27.) She also said Tolkins invited her to a nude birthday party and told her she could leave her spouse at home. Plaintiff claimed that Tolkins would come into the dorm room at night and begin talking to her. When she looked away, he instructed her to look at him when he's talking to her, and then he'd undress for bed in front of her. (*Id.* at 27.) On one occasion, plaintiff claimed Tolkins urinated in a doorway at a fire scene and then ordered her to crawl through it. (*Id.* at 30.) Plaintiff admitted, however, that she never reported such conduct because "anybody that complains or whines" would "just get crapped on." (*Id.* at 27.) Plaintiff also claims that "on any day of the week you can be riding in an engine company with three other guys and if you're driving down the street and see a woman, look at her and they will make comments about her anatomy or about she would do me, yeah. Yeah, you know, she wants me or things like that." (*Id.* at 37.)

The next category of complaints revolves around the restrooms in the station houses. Plaintiff contends that the failure of the department to dedicate separate bathrooms for female employees only contributed to the hostile workplace claim. Many of the station houses were built before there were any women firefighters. As a result, they were constructed without separate bathroom and shower facilities for men and women. Because there were only three women firefighters on the department when plaintiff started, and never more than five, most shifts were entirely made up of men and the others had only one woman. Rather than take turns to use one

7

bathroom, the male firefighters would use whichever one was available. This created problems for the women firefighters, especially before the doors had locks on them. Plaintiff states that when she first started at the department, there were no locks on the bathroom doors, and men would walk in on women and the women would walk in on men. She finally got tired of men walking in on her and told the house captain that she would buy a lock for the door herself. He told her she didn't have to buy it herself and went to the administrative assistant for money to purchase and install locks on the bathroom doors. According to plaintiff, this was in late 1996 or early 1997. (*Id.* at 46-47.)

Even after the locks were installed, however, plaintiff continued to lobby for separate bathrooms for men and women. It was her belief that she was entitled to a separate bathroom under federal law. She also complained that men would use the women's bathroom "for the more oderous portions of their body." (*Id.* at 49-50.) In addition, she found herself walking in on men who were not locking the door and failed to acknowledge their presence, even though she knocked and announced her intention to enter before doing so. Plaintiff claims that a number of firefighters were upset and "hassled" her about why she had to have her own bathroom when they all had to share one. In her view, their complaints over the matter were inappropriate. (*Id.* at 47-48.)

Finally, the third category of behavior plaintiff cites in support of her claim that she was subjected to a hostile work environment concerns the presence of pornography in the fire stations. Plaintiff claims that from the day she started with the department there was pornography in the form of magazines such as Playboy, Hustler and Penthouse, and graphic catalogs for sex toys and sex tapes, in the bathrooms. Plaintiff described one occasion in 1998 when she was called over the public address system and directed to the television room to watch a training video. When she

8

arrived, the acting house captain turned on the video player and a pornographic movie came on. Plaintiff called the house captain and four men sitting there "a bunch of idiots," and left. (*Id.* at 38.) There were other occasions when some of the men would watch "R-rated" movies on cable television, but plaintiff's primary complaint was the pornographic magazines. Plaintiff objected to the presence of pornography in common areas, especially the bathrooms. She first complained to other privates and they'd put it away. When that didn't seem to do any good, plaintiff simply collected it and threw it in the garbage herself. Plaintiff states she complained to the house captain and he said he'd do something about it. Plaintiff stated that when she started making complaints, someone started pulling the magazines out of the lockers and laying them open across the floor with a bottle of lotion next to them. (*Id.* at 39-41.) Plaintiff stated she "found it offensive that after asking repeatedly to have the pornography removed from the women's bathroom it just kept showing up there. (*Id.* at 2.)

As noted in my previous decision, things finally came to the attention of Chief Troeger and the City's Human Resources Department in February of 2001 when plaintiff complained about Schnell to her house captain, who arranged a meeting with himself, a battalion chief, plaintiff and Schnell. Plaintiff and Schnell discussed their differences, and the battalion chief asked them to work things out. Not satisfied with the result, Schnell complained to the union. As a result of his complaint, a meeting was held with Chief Troeger, Melanie Falk of the Human Resources Department, union representatives and plaintiff on February 2, 2001. It was at or shortly before this meeting, in response to Schnell's complaint about her, that plaintiff first brought to the attention of both the Chief and the City's Human Resources Department her complaints about the presence of

9

pornographic material in the station houses and the absence of gender-specific bathrooms. (Def.

PFOF ¶ 72.)[4] Three days later, on February 5, 2001, Chief Troeger issued an order which stated:

> The following guidelines apply to all fire department facilities at all times:
>
>> The display of any material (magazines, catalogs, etc.) that could be considered pornographic or contains pictures or materials that could be offensive is prohibited at all times.
>>
>> The use or viewing of any video that contains pornographic or sexually explicit material is prohibited at all times.
>
> This type of material may be offensive to other employees or the public. Our facilities are open to the public and we regularly host tours of school age children. These children and other members of the public may be in any and all areas of our facilities during these tours. Therefore we should endeavor to provide a positive environment for them as well as our employees.

(Def.'s PFOF ¶ 73.) At the same time, Chief Troeger issued the following guidelines that were to

apply to fire department restrooms:

> In facilities that have gender specific rest rooms, the use of those rest rooms shall be restricted to the gender designated on the entrance. NOTE – this obviously does not apply to cleaning the rest rooms.
>
> In facilities that do not have gender specific rest rooms, ANYONE using the rest rooms at ANY time shall use the lock on the entrance door.

(Def.'s PFOF ¶ 74.)

Also in response to plaintiff's complaint, the City Human Resources Department conducted

an investigation and interviewed 26 witnesses. (Def.'s PFOF ¶ 75.) On April 13, 2001, Chief

Troeger revised his earlier order to prohibit the storage of pornographic materials in any common

---

[4]Although plaintiff claims that "Chief Troeger knew of the leaving of offensive material in the bathrooms on a regular basis and, in fact, admonished an employee for leaving them [sic] there" (Pl.'s PFOF ¶ b), she did not dispute the proposed finding that this was the first time he heard her or anyone else complain about it. The proposed finding is therefore accepted as true. Civil L.R. 56.2(b).

locker or storage area. The revised order noted that such material could be kept in private lockers for viewing by the individual, but was never to be left in public view. Shortly thereafter, sexually graphic material was cleared out of the firehouses, and plaintiff has not seen any since. (Def.'s PFOF ¶ 76-78; Wirth Aff., Ex. 1 at 44-45.)[5] Despite this fact, on April 19, 2001, plaintiff filed her claim with the ERD, and on January 23, 2003, she filed this action.

It should be noted at the outset that, although I previously denied the City's motion seeking summary judgment on the ground that plaintiff's hostile workplace claim was time-barred, many of the allegations of harassment advanced by plaintiff concern events that occurred as long as five years before she filed her claim. It is questionable whether these allegations could reasonably be considered a part of her claim. The alleged comments and behavior of Pete Sponholtz and Tom Tolkins, for example, occurred as far back as 1995 or 1996, and do not appear to bear any relationship to any of the acts that fall within the 300-day period immediately preceding plaintiff's administrative claim. It is arguable whether conduct by other individuals that occurred that long ago and that bears no relation to the conduct alleged to have occurred within the statutory period can be resurrected by the assertion of a hostile workplace claim even under *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). *See Lucas v. Chicago Transit Authority*, 367 F.3d 714, 724 (7th Cir. 2004) (holding that task is to determine whether the acts about which

_____

[5]Plaintiff claimed in response to defendants' proposed finding that "there is currently still [pornographic] material available within the bathrooms and kept in a common locker." (Pl.'s PFOF ¶ c.) Her proposed finding is unsupported by any citation to the record and therefore is disregarded. See Civil L.R. 56.2(b)(1). In addition, it is inconsistent with her deposition testimony in which she testified that after the pornographic materials were removed, it was gone and she never saw anymore. (Wirth Aff, Ex. 1 at 44-45.) Absent any explanation as to why her sworn deposition testimony should not control, I will not consider plaintiff's more recent version of the facts for purposes of deciding the motion before me. *See Brill v. Lante Corp.*, 119 F.3d 1266, 1274 n. 4 (7th Cir. 1977).

employee complains are part of the same actionable hostile work environment practice); *cf. O'Rourke v. City of Providence*, 235 F.3d 713, 731-32 (1st Cir. 2001). It therefore appears that what survives of plaintiff's hostile workplace claim would seem to be primarily her allegations about the presence of pornography at the fire station and the inadequacy of restrooms for female firefighters.

It is also doubtful that the failure to provide gender specific restrooms amounts to evidence of a hostile work environment. The initial problem of men walking in on plaintiff was solved in late 1996 or early 1997, when locks were installed on the restroom doors. Although plaintiff complained that, even after locks were installed, she still found herself walking in on men, there is no indication in the record as to when and how often it occurred. Absent such information, it is unclear whether it rises to the level of a hostile workplace claim. In any event, however, plaintiff's principal complaint concerning the restrooms appears to have been that the station house bathrooms were not dedicated to only one sex. Plaintiff objected to men using the same bathroom that she used. Although plaintiff claims that this in itself is a violation of federal law, she has offered no authority in support of her claim and I have found none on my own. Given the fact that there are no women on some shifts and that men substantially outnumber women on shifts where there are women, it is not immediately apparent why gender-specific restrooms would be required. Thus, it is uncertain whether this aspect of plaintiff's claim will survive.

It is plaintiff's complaint regarding the presence of pornography in common areas of the fire stations, particularly the common or women's restrooms, that provides the strongest support for her claim that she was subjected to a hostile work environment. The mere presence of pornography in the fire station, without more, does not establish a hostile workplace. The United States Supreme

12

Court has held that adults have a constitutional right to view pornography as long as it does not meet the legal definition of obscenity and does not involve children. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). There is even some authority that a fire department may not legally prohibit possession of pornography that is kept for private viewing. *See Johnson v. County of Los Angeles Fire Dep't*, 865 F. Supp. 1430 (C.D. Calif. 1994) (holding that fire department's sexual harassment policy was invalid as applied to captain's private possession, reading and consensual sharing of sexually oriented magazine). But plaintiff's claim is not that her co-workers simply possessed pornographic materials for their own viewing. Her complaint is that pornographic magazines and other materials were kept in the common areas, especially in the bathrooms that she was required to use, and were plainly visible to her and other women firefighters. She also claims that when she complained about it, pornographic magazines were left open on the floor in the woman's bathroom with bottles of lotion along side. (Pl.'s PFOF ¶ 105.) Even when not intentionally directed at her, plaintiff claims that she was offended by the presence of such material in the bathrooms she was required to clean and use. For example, she contends that "at station number 5 there were two lockers that were filled with pornography of the type that she had mentioned – being Playboy, Hustler, Penthouse and sex toy catalogs which were piled from the bottom to the top." (Pl.'s PFOF ¶ 104.) As I held in my previous decision, the evidence offered by plaintiff concerning the prevalence of pornography in the workplace is such that, at least at this point, I cannot say it is insufficient to support a finding of a hostile work environment. *See Williams v. City of Chicago*, 325 F. Supp.2d 867 (N.D. Ill. 2004).

The City contends, however, that even if plaintiff's evidence is sufficient to establish a claim of hostile work environment, her failure to utilize the City's policy against sexual harassment bars

13

her claim. Because she failed to complain to either the Chief or the Director of Human Resources before February of 2001, the City contends it is entitled to the defense recognized in *Ellerth* and *Faragher* and cannot be found liable.

Plaintiff explains her failure to file a formal complaint with the Chief or the Personnel Director earlier by claiming she was trained to follow the chain of command and that complaining directly to the Chief or Human Resources would put her in a bad light. (Brinkley Aff ¶¶ 5-6.) This argument is without merit. Filing a complaint with Human Resources in accordance with an official policy of the City is less likely to put plaintiff in a bad light with her department than filing a federal lawsuit against it. The Seventh Circuit has made clear that an employee's "feelings of futility or unpleasantness do not alleviate her duty to bring her mistreatment to the City's attention." *Durkin v. City of Chicago*, 341 F.3d 606, 613 (7th Cir. 2003); *see also Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment."). Plaintiff's failure to utilize the City's policy is therefore not excused by her desire to avoid alienating her co-workers.

But plaintiff also offers another response to the City's argument. She claims that she did complain about the presence of pornography in the station houses to upper management. Although her claim that she complained to upper management goes beyond what she said at her deposition, she did testify at her deposition that she had made numerous complaints about the presence of pornography:

> Initially I started complaining with just the other privates. Can you get these out of here, Captain? We'd just put them away. And then I just started complaining to everybody. And when that eventually wasn't doing any good, I just started throwing

Case 1:03-cv-00055-WCG    Filed 10/13/05    Page 14 of 16    Document 86

them away.  I'd go in the morning and pick them up and throw them in the garbage.
Well, that got me a little bit of screaming at because some of them were favorites or
something.

Then I started complaining to the house captain.  That seemed to work a little
bit.  He said he was going to do something about it.  He talked to the other captain
at that station; we will take care of it.

(Wirth Aff., Ex. 1 at 39-40.)

The City argues that these complaints don't count because they were not made to either the

department head or the Personnel Director as the City's policy requires.  But it is not clear that

plaintiff failed to utilize the procedure prescribed by the City.  Although the policy statement

"urged" employees who were aware of, or who experienced sexual harassment "to contact the

department head and/or the Personnel Director" (Falk Aff., Ex. 1 at 1-3), the separate handout given

to employees with their payroll information in 1998, 2001, and thereafter instructed employees to

report sexual harassment to "your supervisor, department head or a member of management" or to

one of the listed members of the Human Resources Department.  (Falk Aff., Ex. 2.)  Although the

record is less than clear on the matter, a house captain would seem to fall into the category of

supervisor for the limited purpose here.  By complaining to her house captains, it is therefore

arguable that plaintiff was complying with the City's sexual harassment policy.  At the very least,

it would appear to raise a disputed factual issue for a jury to decide.  *Williams*, 325 F. Supp.2d at

877.

I therefore conclude that a factual issue exists concerning the application of the

*Ellerth/Faragher* defense.  The existence of that factual dispute precludes entry of summary

judgment in favor of the City.  Accordingly, its supplemental motion for summary judgment is

15

denied, and the clerk is instructed to set this matter on for a Rule 16 conference. *See* Fed. R. Civ.

P. 16.

**SO ORDERED.**

Dated this __13th__ day of October, 2005.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
